# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 4610 | **DATE** | 6/18/2001 |
| **CASE TITLE** | Filipovich vs. K & R Express Systems, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
 ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion for summary judgment [40-1] is granted in part and denied in part. Summary judgment is granted in favor of defendants as to Count IV and denied as to Counts I, II, and III. Status hearing and scheduling conference is set on 7/9/01 at 9:30 a.m. to set a date for trial.

(11) ■ [For further detail see order attached to original minute order]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | | **3** number of notices |
| ✓ | Notices mailed by judge's staff. | | JUN 19 2001 date docketed |
| | Notified counsel by telephone. | | |
| | Docketing to mail notices. | | *eqn* docketing deputy initials |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | | 6/18/2001 date mailed notice |
| MD | courtroom deputy's initials | CO-7 FILED FOR DOCKETING 01 JUN 18 PH 5: 02 Date/time received in central Clerk's Office | MD mailing deputy initials |

Document Number

62

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MOMCILO FILIPOVICH,          )
          )
     Plaintiff,         )
          )
     v.          )     **No. 98 C 4610**
          )
K & R EXPRESS SYSTEMS, INC.,    )
          )
     Defendant.      )

DOCKETED

JUN 19 2000

## MEMORANDUM OPINION AND ORDER

Plaintiff's four count complaint alleges that defendant engaged in unlawful employment discrimination violative of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"), and the Civil Rights Act of 1871, 42 U.S.C. § 1981. The complaint seeks redress for retaliation (Count I) and national origin discrimination (Count II) under Title VII, age discrimination under ADEA (Count III), and national origin discrimination under § 1981 (Count IV). Defendant presently moves for summary judgment asserting that plaintiff cannot make out a prima facie case of discrimination, and even if plaintiff could make such a case, defendant had a legitimate, non-discriminatory reason for every alleged adverse employment action. For the reasons articulated below, the court grants defendant's motion in part and denies it in part.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and

62

affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The

party seeking summary judgment bears the initial burden of proving there is no genuine issue of

material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving

party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to

designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia*

v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome

determinative under the governing law. *Insolia*, 216 F.3d at 598-599. Although a bare

contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v.

*Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most

favorable to the non-moving party as well as view all reasonable inferences in that party's favor.

*Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS[1]

The plaintiff, Momcilo Filipovich, was born in Yugoslavia in 1939 and immigrated to the

United States in 1973. In 1982, he began working for defendant, K & R Express Systems, Inc.

("K&R") as a dockman. In 1995, plaintiff unsuccessfully sued K & R, based on EEOC charges

filed in 1993 and 1994.[2] Plaintiff's current lawsuit arises from allegations contained in an EEOC

---

[1]Unless otherwise indicated, the facts recited are undisputed.

[2]The following introductory remarks from the Seventh Circuit opinion issued in plaintiff's first case provide
a brief synopsis of the merits and findings in that action:

On July 19, 1993, the plaintiff-appellant, Momcilo Filipovic ("Filipovic"), filed charges with the
Equal Employment Opportunity Commission ("EEOC"), alleging that his employer, the
defendant-appellee K & R Express Systems, Inc., ("K & R") discriminated against him because of
his Yugoslavian origin and in retaliation for prior complaints of discrimination. Specifically,
Filipovic contended that he was denied a promotion, was "harassed and subject[ed] to derogatory
language," and was given written warnings for various rule infractions. On December 20, 1993,
Filipovic filed additional charges with the EEOC, this time complaining of retaliation based on K
& R's denial of overtime and vacation requests. Some seven months later, on July 19, 1994,

(continued...)

charge filed December 30, 1997, and amended on January 16, 1998. The EEOC issued a Right

to Sue Notice on April 27, 1998, and plaintiff filed this action July 27, 1998.

**Defendant's Discipline of Plaintiff**

K & R describes its discipline policy as follows (the parties dispute whether this policy is

uniformly applied to all workers):

> K&R ascribes to a policy of uniform progressive discipline for the offenses of absenteeism and "no-call no-show," tardiness, stealing company time, not following directions, insubordination, and OSD (overages, shortages and damages) and misdirection of freight, among others. Theft and alcohol or drug use on the job result in immediate discharge. The progressive discipline system is designed to initially educate an employee through a series of verbal, then written, warnings when the employee violates work rules.
>
> "No-call no show" is a disciplinary offense at K&R, similar to absenteeism. Under K&R work rules, if a dockman is going to be absent (or more than 15 minutes late for work) he must call the company at least two-hours before his start time to enable the company to find a substitute. A dockman who fails to do so is guilty of no-call no-show. With respect to no-call no-show, K&R's disciplinary policy is the same as absenteeism, and is as follows: first through fifth offense, verbal warning; sixth offense, written warning; seventh offense, final warning; eighth offense, two-day suspension; a ninth offense within nine months of suspension (or conclusion of s grievance proceeding) results in termination.

(Statement of Undisputed facts ¶¶ 22 & 23 (citations omitted).)[3] With regard to mishandling

---

[2](...continued)

Filipovic filed other charges with the EEOC, alleging that, on the basis of his age, he was "rejected for a promotion." The EEOC issued findings of no cause on all three filings, and Filipovic filed suit in the United States District Court for the Northern District of Illinois, alleging discrimination based on national origin under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Filipovic did not pursue the age discrimination charge. K & R filed a motion for summary judgment which the trial court granted, ruling that certain allegedly discriminatory actions suffered by the plaintiff were time-barred under Illinois law and that the remaining actions did not create a hostile work environment. The plaintiff appeals, contending that he properly stated a claim of discrimination based on national origin under Title VII. We affirm.

*Filipovic* v. *K & R Express Sys., Inc.*, 176 F.3d 390, 392-93 (7th Cir. 1999).

[3]K & R further states that "[a]ll written disciplinary warnings and actions, including suspensions and termination, are subject to review by the union. Any dockman who receives a written warning or is subjected to

(continued...)

freight or bills at K & R's Hinsdale, Illinois terminal, Hub Manager Mark Doerger conducts

investigations to determine who is at fault. Moreover, "if an incident of mishandling freight or

bills occurs within 9 months of a warning letter, a dockman receives a final warning." (*Id.* ¶ 40.)

On March 25, 1997, plaintiff arrived 39 minutes late. The union contract entered into

between K & R and the union of which plaintiff is a member provides that if an employee is

more than 15 minutes late for work, he will not be allowed to work for the day. Plaintiff does not

recall being "suspended or fired" as a result of this incident.[4] On October 9, 1997, plaintiff was

---

[3](...continued)
suspension or termination has the right to file a grievance. Grievances are heard before a six-person joint area committee comprised of three union and three industry representatives. If a grievance is filed by a K&R employee, no member of K&R management is permitted to sit on the committee that hears the grievance." (*Id.* ¶ 26.) Plaintiff claims in his affidavit that "[d]ockmen who receive a written warning are not entitled to file a grievance concerning that warning." (Pl.'s Aff. ¶ 4.) K & R's human resources manager, James Halloran, claims otherwise in his affidavit. Deposition testimony from plaintiff's the local union steward, Robert Pacult, does not support either position. As such, whether plaintiff could grieve written warnings is a factual dispute not appropriately resolved on summary judgment.

[4]The following exchange occurred at plaintiff's deposition:

| | |
|---|---|
| Q. | . . . [W]ere you suspended for being late or for no-call/no-show any time during 1997? |
| A. | Can you answer a question? If I didn't file for EOC charge for be suspended or fired for those instances here, probably I did not been fired, either suspended. |
| Q. | So, you don't recall being fired or suspended in 1997 – |
| A. | That's correct. |
| Q. | – for no-call/no-show? |
| A. | That's very correct. |

(Filipovich Dep. at 170.) Plaintiff submitted an affidavit in response to K & R's motion, however, stating:

On March 25, 1997, I was 39 minutes late for work and I was sent home. Because I was not permitted to work on that day, I was not paid for that day. I also have many times witnessed the arrival of dockmen more than 15 minutes after their shift time and I saw them obtain approval from the dock supervisor to begin work regardless of the union contract rules.

(Pl.'s Ex. A ¶ 3.) Because there is nothing ambiguous or confusing about plaintiff's deposition testimony that he could not recall being fired or suspended in 1997, and because plaintiff provides no explanation for the disparity between the two statements, the court will disregard his later-filed affidavit contradicting such testimony. *See Cleveland* v. *Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) (Lower courts "have held with virtual unanimity that a party cannot create a genuine issue of fact to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity."); *Bank of Illinois* v. *Allied*

(continued...)

issued a warning for several no-call no-show violations.[5] On January 8, 1998, plaintiff was issued another warning for no-call no-show violations, but this warning was retracted after further investigation. During 1997, K & R issued 67 verbal warnings, written warnings, final warnings and suspensions to 21 dockmen other than plaintiff for no-call no-show violations (although, again, the parties dispute whether the letters were issued in a manner consistent with K & R's purported disciplinary policy).

K & R issued plaintiff two written warnings, one on May 28, 1998 and one on September 18, 1998, for mishandling of freight and/or bills, but the parties dispute whether these warnings were justified.[6] The September 18 letter was not designated "final warning," and the parties dispute the significance of this omission, with plaintiff contending that a warning without such designation cannot form the basis of a suspension. On November 10, 1998, K & R issued plaintiff a letter of suspension purportedly for a third incident of mishandling freight and/or bills, the basis of which is also disputed by the parties.[7] Plaintiff submitted a Record of Grievance with his union on November 24, 1998, protesting his suspension. On January 7, 1999, plaintiff's

[4](...continued)
*Signal Safety Rest.*, 75 F.3d 1162, 1171-72 (7th Cir. 1996) (a party may avoid summary judgment through a statement that contradicts an earlier sworn statement in only very limited circumstances such as when the affidavit clarifies ambiguous or confusing testimony or is based on newly discovered evidence). Additionally, the court notes that plaintiff provided no evidence in support of his assertion that he was sent home. Presumably, time cards or other such evidence would have been discoverable by the plaintiff.

[5]The warning letter issued to plaintiff states that plaintiff had been absent from work on January 7, March 25, August 7, September 9, September 29, and September 30 of 1997.

[6]Plaintiff claims that he did not receive the May 28, 1998 warning letter concerned freight being shipped to the wrong destination, that he was instructed to ship the freight to an incorrect location, and that a shipping label indicating the correct destination for the freight was applied after the freight was shipped. As for the September 18, 1998 warning, which concerned a portion of shipment being left at K & R's premises, plaintiff claims that he did not unload or load any freight and, instead, his shipping orders indicated that he should leave the freight loaded on the trailer as he found it.

[7]K & R claims that plaintiff improperly left freight on a loading dock and plaintiff denies this allegations.

appeal was denied and his suspension upheld. The parties also dispute whether K & R followed its own disciplinary policy with regard to plaintiff's suspension.

On December 22, 1998, K & R issued plaintiff a written warning for failure to follow instructions, but this warning was retracted after further investigation.[8] K & R issued plaintiff another warning on December 31, 1998, the basis of which is again disputed, for plaintiff's purported mishandling of freight and/or bills. The December 31, 1998 letter was not marked final and plaintiff was not suspended as a result of the letter's issuance. On August 31, 1999, K & R issued plaintiff a final warning letter for the mishandling of freight and/or bills, and again, plaintiff disputes the basis for this discipline. Between March 1, 1997 and October 1, 1999, K & R issued over 140 written warning letters to dockmen other than plaintiff for the offense of mishandling freight and/or bills, 13 suspensions or terminations to dockmen other than plaintiff for the same type of offense, and 22 suspensions or terminations for other types of offenses, including misuse of company time, no-call no-show, and failure to follow instructions.

K & R issued plaintiff a letter of suspension on October 26, 1999, based on the alleged mishandling of freight and/or bills. Plaintiff also disputes the basis for this letter and asserts, without any citation to the record, that this letter was reduced to a warning letter after plaintiff threatened to grieve the suspension.[9] On December 15, 1999, K & R issued plaintiff another suspension letter for alleged, and disputed, mishandling of freight and/or bills, and suspended plaintiff for one day (December 21, 1999). Plaintiff successfully grieved this suspension and received full pay for the day he was not permitted to work.

---

[8]The parties dispute whether a retraction or reduction of a warning letter would be reflected in an employee's file.

[9]The court notes, however, that K & R does not appear to dispute that the discipline was indeed reduced.

Plaintiff sets forth evidence of K & R's discipline of other employees. For instance, K & R issued Richard Lozdoski the following series of disciplinary letters: June 4, 1998: warning for mishandling of freight and/or bills; September 28, 1998: warning for mishandling of freight and/or bills; December 22, 1998: warning letter for the mishandling of freight and/or bills; February 9, 1999: warning letter for a preventable accident; and April 8, 1999: final warning letter for the mishandling of freight and/or bills. Union steward Pacult testified at his deposition that the reason Lozdoski was issued warning letters instead of a final warning may have been the result of union negotiations.[10] Moreover, K & R issued Scott Noel a series of disciplinary letters as follows: August 20, 1998: warning letter for the mishandling of freight; September 18, 1998: warning letter for the mishandling of freight; February 15, 1999: warning letter for the mishandling of freight; April 26, 1999: warning letter for the mishandling of freight and/or bills; and May 11, 1999: final warning letter for the mishandling of freight and/or bills. Pacult testified with regard to Noel's discipline that he believed a couple of the letters were "questionable" and might have been "tossed out." (Pacult Dep at 184.) Plaintiff similarly submits evidence that he believes shows that at least seventeen other dockmen were treated to more favorable discipline and K & R similarly disputes the circumstances leading to this conclusion.

**Plaintiff's May 13, 1997 Injury and Resultant Workers' Compensation Claim**

Plaintiff suffered an injury while at work on May 13, 1997. On May 15, 1997, K & R's

---

[10]The pertinent deposition testimony is as follows:

Q. Is it possible that Mr. Lodzoski got warning letters as opposed to final warning letters because the union successfully negotiated them down to warnings.
A. That is possible, that is very possible. Because we do a lot of talking in these offices. And sometimes the manager will give the guy a break and say, okay, we will go this way with it.

(Pacult Dep. at 180-81.)

company doctor examined plaintiff and diagnosed him with "contusions," prescribed pain medication, ordered a follow-up exam in three days, and released plaintiff to return to work for "light duty" with various restrictions. The parties dispute whether on May 16, 1997, K & R's human resources manager, James Halloran, told plaintiff he didn't have faith in the doctor plaintiff saw and instructed him to see another company doctor or whether "light duty" was unavailable. It is undisputed, however, that plaintiff was sent home on May 16, 1997, and returned to work to be examined by a company doctor on May 19, 1997. At the May 19 exam, plaintiff refused to submit to x-rays suggested by the doctor, citing concerns about excess radiation exposure since he had submitted to 34 x-rays in the previous year for a broken toe injury. Plaintiff claims that the examining doctor refused to explore an alternative to an x-ray. Following the exam, plaintiff returned to work and met with Halloran, who instructed plaintiff to go home.[11]

On May 22, 1997, plaintiff saw a private physician, Dr. Morganstern, who scheduled him for an MRI examination due to plaintiff's refusal to be x-rayed but explained that an x-ray may be needed if plaintiff continued to experience symptoms of injury. Dr. Morganstern did not release plaintiff for work on May 22 and further examined plaintiff on various dates without releasing him for work until August 4, 1997.

As previously mentioned, plaintiff injured his toe prior to the May 13, 1997, injury and

---

[11]The parties dispute whether Halloran sent plaintiff home with a letter explaining that he would not be eligible for workers' compensation benefits until he followed "the prescribed treatment of the doctor," which meant submitting to an x-ray so the doctor could further diagnose plaintiff's injury. (Def.'s Ex. 29.) Halloran testified at his deposition that he sent plaintiff home with the letter on May 19, but the letter bears a date of May 21, 1997, and a purported amended version of the letter bears a date of May 22, 1997. In addition, both letters state in the upper right hand corner "Certified # Z351 398 434," but defendant failed to submit a certified mailing receipt. On the other hand, plaintiff's attorney wrote a letter in June to K & R's workers' compensation administrator referencing "Mr. James Halloran's letter dated May 22, 1997." (Pl.'s Ex. K.)

submitted to an x-ray examination of his foot by K & R's doctor. There was no delay in the workers' compensation total temporary disability ("TTD") payments resulting from this injury.[12] As early as June 9, 1997, K & R's workers' compensation claim administrator, Baldwin & Lyons, Inc. (a/k/a Protective Insurance), received medical information regarding plaintiff's injury. Plaintiff never requested that Dr. Morgenstern send his diagnosis to Baldwin & Lyons but claims to have believed K & R would forward such information. On June 18, 1997, however, plaintiff's workers' compensation attorney sent a letter to Baldwin & Lyons stating that pursuant to their conversation of the same date, he was forwarding "Itasca Medical Center slips signed by Dr. Morgenstern keeping Mr. Filipovich off work" and "Bolingbrook Medical Center (company clinic) notes showing only light duty work." (Pl.'s Ex. K.) Also on June 18, plaintiff's attorney sent Itasca Industrial Medical Center a subpoena for plaintiff's medical records. On June 30, 1997, Halloran wrote to Baldwin & Lyons asking whether K & R should begin paying plaintiff's claim. On July 7, 1997, plaintiff's attorney forwarded Itasca's medical records regarding the injury. Baldwin & Lyons issued plaintiff's first workers' compensation check on July 8, 1997.

A former employee of Baldwin & Lyons who worked on plaintiff's claim attested that "[i]t was Baldwin & Lyons' policy to not authorize the payment of any workers' compensation benefits, including total temporary disability payments (TDD) until [it] received medical documentation indicating a medical disability causally related to the alleged workers' compensation injury." (Tomlinson Aff. ¶ 3.) Although plaintiff did not receive payments for six weeks, most TDD payments begin after approximately three weeks. Halloran knew that during

---

[12]A factual dispute exists regarding whether K & R's normal practice is to begin paying TDD benefits after receiving a doctor's note stating that an employee could not return to work. Halloran's deposition testimony regarding K & R's practice is inconsistent, and the court will not resolve this dispute upon K & R's summary judgment motion.

the period plaintiff was not working, he had no other means of support. Pacult testified at his deposition that he knew of two other cases where employees claimed that TDD payments were delayed, and neither employee is Yugoslavian.

**Plaintiff's Attempts to Qualify as a Spotter**

    a.    **K & R's Version of Events**

The parties significantly dispute the facts surrounding plaintiff's claim that he was improperly denied a spotter position.[13] K & R claims as follows: Steve Weigand, K&R's safety manager, became responsible for spotter training in November 1997. Since that time, spotters are chosen and trained by posting a sign-up sheet and assigning a road test time. Moreover, training is only offered to employees who signed the posted sign-up sheet, and K & R only qualifies spotters when there is a need for spotters on the dock. In November 1997, Weigand posted a spotter sign-up sheet, which plaintiff signed, but plaintiff declined to take a road test. K & R posted another sign-up sheet in June 1998, which plaintiff signed. Plaintiff was then scheduled for a road test on June 22, 1998 at 10:00 a.m. Plaintiff arrived an hour and a half late for this test, however, and Weigand needed to reschedule the test because he was leaving town immediately. Plaintiff failed to appear at the rescheduled test on June 29, 1998, and failed to schedule a road test for a different date.

Plaintiff filed a Record of Grievance with his union on July 10, 1998, which stated as follows:

> THIS IS A PROTEST AND PAY CLAIM - I HAD BEEN PREVIOUSLY
> AWARDED THROUGH THE GRIEVANCE PROCEDURE THE

---

[13]"A spotter moves trucks between various loading docks." *Filipovic*, 176 F. 3d at 394 n.1. While it is undisputed that plaintiff would receive a pay increase as a spotter, the parties dispute whether this pay increase is substantial and whether other benefits accrue from this position.

OPPORTUNITY TO BE A QUALIFIED SPOTTER - THE COMPANY WAS
TO AFFORD ALL NEW SPOTTER CANDIDATES THE OPPORTUNITY TO
TRAIN AND QUALIFY - IN SENIORITY ORDER OF THOSE WHO SIGNED
THE LIST OF CANDIDATES. THE COMPANY SINCE ON OR ABOUT
JUNE 20-22 BEGAN TRAINING AND QUALIFYING MEN JUNIOR TO ME -
I DEMAND THAT I BE PAID ALL MONIES THAT WERE NOT AFFORDED
ME BECAUSE THE COMPANY TRAINED JUNIOR EMPLOYEES - I ALSO
DEMAND ALL INFORMATION RELEVANT TO THE COMPANY
TRAINING JUNIOR EMPLOYEES SINCE ON OR ABOUT JUNE 20 - 1998
INCLUDING TIME CARDS AND PAY STUBS[.] I ALSO DEMAND THAT
THE COMPANY IMMEDIATELY TRAIN ME TO QUALIFY TO SPOT AND
PAY ME FOR THE TIME SPENT AS THEY HAVE WITH JUNIOR MEN
SPECIFICALLY RICHARD LOBOZNY.

(Def.'s Ex. 38.) On August 27, 1998, the union issued the following disposition: "CLAIM AND

PROTEST DENIED (COMPANY AND UNION INSTRUCTED TO SET A DATE [TO TRAIN

PLAINTIFF] WITHIN THE NEXT 60 DAYS)." (Def.'s Ex. 39.) In September 1998, Weigand

gave plaintiff a road test and spent an hour and a half with plaintiff at this training session.

Weigand scheduled a second training session for plaintiff a few days later in September, but

plaintiff failed to appear. Weigand then scheduled a training session for October 2, 1998, but

plaintiff canceled. Weigand and plaintiff met on October 9, 1998 for training. Weigand noted

that at this session, he and plaintiff were "still working on shifting [and that plaintiff was] very

poor with gear selectry." (Def.'s Ex. 37.) In mid-October, 1998, plaintiff asked Weigand to

observe his spotter skills, and Weigand agreed to do so when he returned from his vacation.

Near the end of October, plaintiff told Weigand that he wanted to begin training again, but

Weigand does not recall speaking to plaintiff again about spotter training until April 1999.

Weigand also has no knowledge of plaintiff self-training after October 9, 1998. Another

dockman at K & R, who worked as a spotter at the Hinsdale Terminal from 1:30 p.m. to 10:00

p.m. every week day, also stated that he never saw plaintiff engaged in any self-training during

the period of October through December, 1998, and that if anyone had been so engaged during this period, he would have seen it. In addition, Weigand stated that no spotter took more than six weeks to complete training.

K & R posted another spotter sign-up sheet in December 1998 or January 1999, plaintiff did not sign this sheet although five other dockman did sign the sheet. A younger, non-Yugoslavian dockworker who signed the sheet was trained as a spotter. Plaintiff contacted Weigand on April 16, 1999, and told Weigand that he wanted to resume spotter training, and on April 22, 1999, Weigand denied plaintiff's request because he had quit training in October and had not come in for six months. Weigand told plaintiff's union steward, Bob Pacult, however, that plaintiff could resume training the next time K & R needed spotters and posted a sign-up sheet. Plaintiff, however, had told Pacult that he would refuse to sign any more spotter sign-up sheets. On June 1, 1999, Weigand told plaintiff that he could resume training the next time K & R posted a sign-up sheet, but plaintiff insisted on obtaining a truck and training immediately. Weigand told plaintiff that plaintiff had no authorization for this and that Weigand would call the police if plaintiff attempted to obtain a truck and train. Several other dockmen who began spotter training never became qualified spotters. In addition, as of June 17, 1999, eleven out of fourteen dockmen who were qualified spotters were over 40 years old.

### b. Plaintiff's Version of Events

Before early spring 1997, K & R stated that any dockman could be trained as a spotter upon stating an interest in such a position, but at the same time had a policy of training only new hires for use as spotters on a periodic and flexible basis.[14] These new hires were referred to as

---

[14]Plaintiff contends that all dockmen trained as spotters were ten percenters, but the evidence submitted in
(continued...)

"ten percenters" because they consisted of the bottom 10% of the union seniority list. The "ten percenters" were all younger than plaintiff. K & R first posted a sign-up sheet for spotters in Spring, 1997, and although many dockmen signed the sheet, K & R chose only junior dockmen for training.

In November 1997, when there was a need for additional spotters, plaintiff signed the posted sign-up sheet. In December 1997, plaintiff explained to Weigand that he had already taken a road test when he received his commercial driver's license. Moreover, Weigand did not attempt to schedule any road test with plaintiff and refused to provide any spotter training at this time.

After signing a posted sign-up sheet in June, 1998, plaintiff scheduled a road test, arrived 15 minutes late, and Weigand refused to conduct the test. Although Weigand stated that he needed to leave town immediately as the reason for refusing to give the test, plaintiff waited in the parking lot for approximately two hours and did not observe Weigand leave. Weigand never rescheduled the road test. Plaintiff asked Hub Manager Mark Doerger for another opportunity to begin training, but Doerger told plaintiff he must discuss the matter with Weigand.

In July, 1998, plaintiff filed a Record of Grievance, and Weigand testified at the grievance hearing that he would not train plaintiff as a spotter because he was late for the June, 1998 road test. After the grievance committee determined that K & R should train plaintiff, plaintiff scheduled and started his first training session with Weigand in September 1998. Plaintiff met with Weigand a few days later for an additional training session, which lasted about

---

[14](...continued)
support of this contention reveals only that the ten percenters were trained as spotters used on "a periodic and flexible basis, such as filling in for full-time spotters who are absent or assisting during seasonal peak loads." (Pl.'s Ex. T ¶ 15.)

an hour and a half. These were plaintiff's only training sessions with Weigand.

In mid-October, plaintiff asked Weigand to observe his progress so that plaintiff could move to the second stage of training. Weigand agreed to observe after he returned from a vacation and instructed plaintiff to continue to train by himself, which plaintiff did from October 1998 until mid-December 1998. Plaintiff doesn't believe anyone saw him self-train, but claims that one of K & R's supervisors, Chris Winfrey, gave plaintiff a set of truck keys to assist plaintiff. Plaintiff did not see any sign-up sheets posted in December 1998 or January 1999. Plaintiff also attempted to contact Weigand by telephone and left numerous telephone messages regarding starting the second stage of his training. Moreover, plaintiff asked Weigand in person at least twice to begin the second stage of training. Although Weigand stated he would get back to plaintiff about the second stage, he never did, and plaintiff stopped his self-training due to winter weather conditions and Weigand's decision not to start the second training stage. Plaintiff contacted Weigand in mid-April 1999 to continue his training, but Weigand refused and threatened to have plaintiff arrested if he tried to resume self-training. Weigand also told plaintiff that he could not seek the help of other experienced spotters. Pacult testified at his deposition that experienced spotters help train spotter-trainees and Weigand gave conflicting testimony at his deposition as to whether he told other trainees not to speak with experienced spotters.

Although K & R prefers that spotter applicants take the qualification test as soon as possible after taking the road test, there is no specific time frame when an applicant must take the qualification test. Moreover, once a dockman is in spotter training, he needn't sign later posted sign-up sheets, and K & R made a dockman a spotter without training in September 1997, but

trained him afterwards.[15]

**Hostile Work Environment**

Plaintiff claims that on December 9, 1998, assistant union shop steward Jim Leonhardt confronted him and asked plaintiff if he needed any Christmas money donated to him because plaintiff had spent everything he had to file charges against the Teamster Union and K & R, and immediately after this statement Leonhardt made an obscene gesture. Plaintiff also claims that on December 12, 1998, Leonhardt stated, among other things he can no longer recall, "How you doing, Brother European. How you dealing with nightmares?" (Pl. Dep. at 166.) Plaintiff further contends that Leonhardt harassed him from April 28, 1998 through May 29, 1998, but fails to give any specifics regarding this alleged harassment. Other claims of harassment include (1) plaintiff being struck from behind by a forklift driven by another dockman, Mr. Patterson,[16] (2) that on some unknown date he found a sign on his locker implying that he was homosexual, and (3) that on another occasion he found a calendar page posted on a cafeteria wall stating that he and four other dockmen were scheduled to take HIV tests.

Union steward Pacult testified that such signs and graffiti show up all over the locker room, but plaintiff claims that this behavior is only directed at him and two other dockmen. K & R recites, but failed to provide to the court the purported supporting deposition testimony, that

---

[15]Plaintiff claims, without any citation to evidence in the record, that all but one of K & R's current spotters were trained when they were under 40. K & R responds that one of the current spotters began working at K & R at age 43 and, therefore, could not have been under 40 when trained. Hence, although plaintiff did not support his factual statement, K & R does not appear to dispute that all but one of its current spotters were trained when they were under 40 years old.

[16]Plaintiff also asserts that Patterson's conduct of obscene gestures, taunting and ethnic slurs for almost a year was objectively hostile. Although plaintiff cites both to his affidavit and deposition, plaintiff only provided the court with his affidavit stating that Patterson struck plaintiff with a forklift. The cited deposition testimony was not provided by either party.

plaintiff testified at his deposition "that since January 1, 1996, nobody at K&R said anything to him that he construed as derogatory toward his national origin," that plaintiff is "subject to name calling less frequently than he was prior to the time he filed his first lawsuit," and that "he hadn't received as many disciplinary letters since he filed his lawsuit." (Statement of Undisputed Facts ¶¶ 108 & 109.) Plaintiff claims in an affidavit, without further elaboration, that "[t]he comments concerning my ethnic origin have continued, but are not as offensive," and that he "has not received as many disciplinary letters in total since filing his first lawsuit, but [he] received multiple, unjustified disciplinary letters and suspensions in the past two years." (Pl.'s Ex. A ¶ 41.) Plaintiff believes he is the same race as K & R's president, Larry Klong.

## DISCUSSION

### Title VII Claims - Counts I & II

Plaintiff contends that K & R engaged in discriminatory retaliation for his protected Title VII activities, namely, this law suit and his prior law suit, that K & R discriminated against him on account of his national origin and that similarly situated non-Yugoslavian/Serbian employees were more favorably treated. Plaintiff presents no direct evidence of discrimination and relies on the burden-shifting method of proving discrimination set forth in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973).[17] Under the *McDonnell Douglas* framework, plaintiff must first establish a prima facie case of discrimination through indirect evidence. To establish a prima facie case of disparate treatment race discrimination, plaintiff must show (1) he belongs to a

---

[17]Direct evidence of discrimination is evidence that "if believed by the trier of fact, will prove the particular fact in question without reliance on inference or presumption." *Walker* v. *Glickman*, 241 F.3d 884, 888 (7th Cir. 2001) (internal quotation marks and citation omitted).

protected class, (2) he performed his job satisfactorily, (3) he suffered an adverse employment

action, and (4) K & R treated similarly-situated employees outside of plaintiff's protected class

more favorably. *See Stockett* v. *Muncie Indiana Transit Sys.*, 221 F.3d 997, 1001 (7th Cir.

2000).[18]  To prove a prima facie case of retaliation, plaintiff must show "(1) he engaged in

activity protected under Title VII, (2) he suffered an adverse employment action, and (3) a causal

connection between the adverse action and his protected activity." *Fyfe* v. *City of Fort Wayne*,

241 F.3d 597, 601 (7th Cir. 2001).  Plaintiff's evidence on his "prima facie case need not be

overwhelming or even destined to prevail; rather, . . . plaintiff need present only 'some evidence

from which one can infer that the employer took adverse action against . . . plaintiff on the basis

of a statutorily proscribed criterion.'" *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 493 (7th Cir.

2000) (quoting *Leffel* v. *Valley Fin. Servs.*, 113 F.3d 787, 793 (7th Cir. 1997)).

With regard to plaintiff's count I retaliation claim, K & R argues that plaintiff cannot

meet either the adverse employment action or the causal link requirements of a prima facie

case.[19]

> An adverse employment action is a materially adverse change in the terms and
> conditions of employment that is more disruptive than a mere inconvenience or an
> alteration of job responsibilities.  Adverse employment actions encompass more
> than simply the termination of employment or a decrease in salary.  They also may
> include actions such as bestowing on an employee a less distinguished title, a

---

[18]If plaintiff can prove his prima facie case, the burden of production then shifts to defendant to articulate a nondiscriminatory reason for its employment decision, but the burden of persuasion always remains with the plaintiff. *See Texas Department of Cmty. Affairs*, 450 U.S. 248, 253 (1981); *Freeman* v. *Madison Metro. School Dist.*, 231 F.3d 374, 379 (7th Cir. 2000); *Malacara* v. *City of Madison*, 224 F.3d 727, 729 (7th Cir. 2000).  If defendant articulates such non-discriminatory reason, the burden will then shift back to plaintiff to establish that defendants' stated reason is pre-textual and that a discriminatory reason actually formed the basis for defendants' actions.  *See Freeman*, 231 F.3d at 379; *Malacara*, 224 F.3d at 729.

[19]As plaintiff filed his EEOC charge on December 30, 1997, only events occurring after March 5, 1997 may form a basis for this lawsuit.  *See* 42 U.S.C. § 2000e-5; *Hardin* v. *S.C. Johnson & Sons, Inc.*, 167 F.3d 340, 344 (7th Cir. 1999) ("Under Title VII, a plaintiff has 300 days from the occurrence of an allegedly discriminatory act in which to file a timely charge . . . .")

material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. It is well established that conditions of employment that are designed to harass and humiliate employees because of their race are actionable adverse employment actions under Title VII.

*Stockett*, 221 F.3d at 1001 (citations, internal quotation marks, and alterations omitted). Plaintiff complains that the following constitute adverse employment actions: (1) the alleged deliberate withholding of workers' compensation benefits; (2) the alleged wrongful disciplinary action taken in 1998 (specifically, the warning letters issued May 28, 1998 and September 18, 1998, the two day suspension issued November 10, 1998, and the December 31, 1998 warning letter); and (3) the alleged wrongful disciplinary action taken in 1999 (specifically, the August 31, 1999 warning letter, October 26, 1999 suspension letter later reduced to a warning letter, and the December 15, 1999 suspension).

Assuming the three-week delay of benefits would qualify as an adverse employment action, the court cannot find that plaintiff has met the causal connection requirement regarding the alleged delay in workers' compensation benefits. As the Seventh Circuit explained to plaintiff in his earlier case, a causal link may be shown, in the absence of direct evidence, when the adverse employment action "took place on the heels of protected activity. A substantial time lapse between the protected activity and the adverse employment action is counter-evidence of any causal connection." 176 F.3d at 399 (citations and internal quotation marks omitted). Plaintiff filed his EEOC complaint for this action on December 30, 1997, the alleged benefits delay occurred *earlier*, in May, 1997 (he received his first check in August, 1997). Thus, the delay could not have been in retaliation for the December charge. The court also rejects plaintiff's argument that a causal connection exists between K & R's lawyers filing a summary

judgment motion in plaintiff's first lawsuit in April, 1997 and the May, 1997 events. There is absolutely no evidence that Halloran, K & R's human resource manager, had knowledge of when defendant's attorneys filed moving papers in plaintiff's first case and, further, in light of plaintiff's admission that he resisted K & R's request for an x-ray of his foot and that time passed while this was worked out, the court could not reasonably infer that the filing of a summary judgment motion spurred retaliatory conduct.

The disciplinary actions, however, cannot be as easily dismissed. First, even if this court were to accept that any single disciplinary action did not constitute an adverse employment action, the amount of discipline, and the fact that plaintiff was suspended, certainly qualify as materially more disruptive than a mere inconvenience. Second, a genuine fact dispute exists regarding whether this discipline was justified. If, indeed, K & R repeatedly wrongfully disciplined plaintiff, this would militate against a finding that no causal connection exists even though the first incident occurred approximately five months after plaintiff's EEOC filing and one month before he filed this lawsuit. Because significant factual disputes surround K & R's discipline of plaintiff, summary judgment is inappropriate on count I with respect to the discipline issue.

Material factual disputes similarly surround plaintiff's count II allegations and the discipline meted out against plaintiff. Plaintiff has submitted enough evidence to show that a factual dispute exists regarding whether similarly situated non-Yugoslavian employees were treated more favorably. In the two examples of similarly situated employees receiving better treatment, K & R did not present sufficient evidence establishing why these two other employees received different treatment than plaintiff and, as mentioned above, similar factual disputes exist

regarding a number of other employees. Therefore, even if K & R believed that plaintiff's discipline was well-founded, this would not explain why other disciplined employees were treated better While it may be true, as K & R suggests, that "imperfection is not discrimination," Def.'s Reply at 10, plaintiff has presented enough evidence to show that a fact issue remains as to whether K & R purposely discriminated against plaintiff when it meted out its imperfect discipline.

Plaintiff has failed to prove, however, that other similarly situated non-Yugolsavians were treated more favorably with regard to spotter training. The only non-Yugolsavian trainee that plaintiff directs this court's attention to is an employee who signed a sign-up sheet that plaintiff admits he didn't sign. Hence, that employee was not similarly situated and the allegations regarding spotter training cannot form the basis of Title VII relief. Moreover, plaintiff wholly fails to present a claim based on a hostile work environment, which requires severe or pervasive conduct that alters the conditions of an employee's employment. *See Mason* v. *Southern Ill. Univ.*, 233 F.3d 1036, 1043 (7th Cir. 2000). Plaintiff has failed to present evidence sufficient to create a fact issue that there existed either severe or pervasive conduct.

## ADEA Claim - Count III

Similar to the prima facie case required for a disparate treatment national origin claim, in order to make out a prima facie case of age discriminations, plaintiff "must show that: (1) [he] was a member of a protected class of persons 40 or older; (2) [he] was performing [his] job satisfactorily; (3) [he] suffered an adverse employment action; and (4) substantially younger, similarly situated employees were treated more favorably." *Wade* v. *Lerner New York, Inc.*, 243 F.3d 319, 322 (7th Cir. 2001). K & R does not dispute that all but one spotter was trained when

he or she was under the age of 40. Significant fact issues surround plaintiff's claim that he was prevented from training, thereby making him ineligible to qualify as a spotter and treated other trainees more favorably. Certainly preventing plaintiff from training, as plaintiff claims, would be less favorable treatment and, additionally, the conflicting testimony regarding why other trainees were allowed to train with experienced spotters while plaintiff was not raises a fact question. Whether to accept plaintiff's version of the fact is, of course, the job of a trier of fact, not a task for this court on a motion for summary judgment.

### § 1981 Claim - Count IV

K & R argues that plaintiff's count IV allegations of discrimination because he is Yugoslavian/Serbian cannot form the basis of a § 1981 action and cites, among other cases, *Von Zuckerstein* v. *Argonne Nat. Lab.*, 984 F.2d 1467 (7th Cir.), *cert. denied*, 510 U.S. 959 (1993). In *Von Zuckerstein*, the Seventh Circuit, while acknowledging that the line between national origin and race or ethnicity is not bright, held that "claims founded on [a "foreign born"] status are not cognizable under section 1981." 984 F.2d at 1472. The Seventh Circuit continued to find, however, that although the plaintiffs in that case would have had a stronger case "had they alleged and argued discrimination based on race or ethnicity rather than national origin . . . , failure to plead discrimination based on race or ethnicity for section 1981 purposes is not necessarily fatal to their cause." *Id.* Although plaintiff labeled his count IV claim as "ethnic/race discrimination," plaintiff failed to respond to K & R's argument that his allegations fall within *Von Zuckerstein*'s prohibition, and, therefore, plaintiff makes no argument that his claims should not be construed as founded on a "foreign born" status. As such, the court considers any claim based on § 1981 either withdrawn or conceded to be without merit and grants summary judgment

in defendant's favor on Count IV.

## CONCLUSION

For the above-stated reasons, the court grants in part and denies in part defendant's

motion for summary judgment [#40].  Summary judgment in granted in defendants favor on

Count IV and denied for Counts I, II, and III.  This matter will set for trial at a final scheduling

conference on July 9, 2001 at 9:30 a.m.   In the meantime, the parties are directed to confer about

the possibility of settlement.


Date: June 18, 2001                              Enter: _Joan H. Lefkow_____

                                                          JOAN HUMPHREY LEFKOW
                                                          United States District Judge